### IN THE

# SUPREME COURT OF TENNESSEE

#### FOR THE

## MIDDLE DIVISION

### NASHVILLE.   DECEMBER TERM, 1924.

CENTRAL BANK & TRUST CO. *v.* SAM COHN *et al.*[*]

*(Nashville.   December Term, 1924.)*

1. **JUDGMENT.** Evidence held to show loan advanced to purchaser of judgment against three debtors was procured on credit of one of such debtors.

 Evidence *held* to show that a bank's loan to enable borrower to buy a judgment against three debtors jointly liable, one of whom was the borrower's friend, was made on the credit of such debtor, and that the borrower was a mere man of straw in the purchase of the judgment; the purpose being to keep judgment alive. (*Post, pp.* 382-400.)

2. **COURTS.** Court's findings and opinion in former case held law of case on issue of nature of judgment rendered in former case.

 Court's findings and opinion in a former case *held* the law in a subsequent action on the issue as to the nature of the judgment or decree rendered in the former case. (*Post, pp.* 400-414.).

3. **JUDGMENT.** Judgment paid by one of three of joint debtors, but with intention to keep judgment alive, held not extinguished by such payment.

Where three defendants who were held jointly liable for conversion of a trust note knew of the trust instrument, but did not know of the fraud which the trustee perpetrated in selling the note to codefendant C., *held*, that they were not joint tort-feasons in the sense that payment by any one of them of judgment against them would be a satisfaction thereof, so that, where C. in fact paid the judgment, but it was the intention of the parties to keep the judgment alive, the judgment was not extinguished. (*Post, pp.* 400-414.)

Cases cited and approved: Going v. Going, 148 Tenn., 522; City of Bristol v. Bostwick, 146 Tenn., 205; Alexander v. Anderson, 66 Tenn., 403; Covington v. Anderson, 84 Tenn., 310; Caulkins v. Gas Light Co., 85 Tenn., 684; Ford v. Brown, 114 Tenn., 467; Rhea v. White, 40 Tenn., 121; Lingard v. Brownley, 1 Ves. & B., 114; Thweath's Adm'r v. Jones' Adm'r, 1 Randolph, 328; Maxwell & Co. v. L. & N. R. R. Co., 1 Tenn. Ch., 8; Selz v. Unna, 6 Wall., 527; Adamson v. Jarvis, 4 Bing., 66; Jones ex parte, 1 Molloy, 63; Farwell v. Becker, 129 Ill., 261; Vandiver v. Pollack, 107 Ala., 547.

Cases cited and distinguished: Merriweather v. Nixon, 8 T. R., 186; Peck v. Ellis, 2 J. C. R., 131; Thweath's Adm'r v. Jones' Adm'r, 1 Randolph, 328.

4. **BILLS AND NOTES.** Bank, liable jointly with others for conversion of trust note, held not entitled to recover amount of note from transferor on theory of implied warranty.

Where a joint judgment was obtained against a bank, C., and the maker of a trust note for conversion of such note, based on C.'s act in purchasing the note from the trustee and selling it to the bank to which maker thereafter made payments, complainant bank, which was compelled to pay the judgment, *held* not entitled to recover full amount of note against C. on theory of implied warranty; such rule applied to the purchase of trust property being against public policy. (*Post, pp.* 414, 415.)

5. **CONTRIBUTION.**  Application of theory of contribution to three joint judgment debtors held to meet equities of case.

Where with respect to a transaction involving a trust note judgment was obtained against a bank, C., and the maker of the note for its conversion, based on C.'s act in purchasing the note from the trustee and selling it to the bank to which the maker thereafter made payments, equities of the case with respect to the payment of the judgment *held* met by application of the theory of contribution, each defendant to pay one-third of the judgment.  (*Post, pp.* 414, 415.)

6. **JUDGMENT.**  Judgment debtor paying judgment held entitled to contribution from each of remaining codefendants, though such relief not prayed for.

Where a bank which paid a judgment on which two others were jointly liable was entitled to contribution of one-third from each of remaining codebtors, and instituted suit against such codebtors to recover the full amount it paid, basing its relief on the erroneous theory the judgment at the time execution was levied against bank's property had been paid by one of codebtors, the bank *held* entitled in such suit to recover one-third from each of codebtors, notwithstanding its bill did not specifically pray for such relief. (*Post, p.* 415.)

---

*Headnotes 1.  Judgments, 23 Cyc, p. 1470 (1925 Anno); 2.  Courts, 15 C. J., section 306; 3.  Judgments, 23 Cyc, p. 1470; 4.  Bills and Notes, 8 C. J., section 579 (1925 Anno); 5.  Contribution, 13 C. J., section 21; 6.  Judgments, 33 C. J., section 90.

---

FROM DAVIDSON.

---

Appeal from the Chancery Court of Davidson County. —HON. JOHN K. AUST, Chancellor.

BASS & SIMS and JOHN B. KEEBLE, for plaintiff.

NATHAN COHN, JORDON STOKES and W. E. NOWELL, JR., for defendants.

MR. MALONE, Special Judge, delivered the opinion of the Court.

The Central Bank & Trust Company filed the bill in this case against Sam Cohn, B. F. Wilkerson, Jacob May, Louis Camp, sheriff of Davidson county, and T. G. McCampbell, one of his deputies.

One theory of the bill was that the defendant McCampbell, deputy sheriff, at the instigation of his codefendants Sam Cohn and Jacob May, had wrongfully levied an execution on certain moneys, the property of said bank.

The defendant Cohn and the complainant, Central Bank & Trust Company, and the defendant Wilkerson had been held liable for the conversion of a certain trust fund in a former litigation. The present litigation arises from the attempts of these parties to escape primary liability under said former decree.

The complainant, Central Bank & Trust Company, insisted that under the facts of the previous case Sam Cohn was primarily liable, and was endeavoring to have the execution creditor place the execution in the hands of an officer who would levy the execution on Cohn's property.

The defendant Cohn, learning of this, conceived the idea of having a friend purchase the judgment, who would have execution levied on the property of the bank. The defendant May undertook to assist him in this mat-

ter, and purchased the judgment at the instigation of Cohn and his counsel.

The complainant in its bill contends:

(a) That under the facts developed in the former case the defendants Cohn and Wilkerson were primarily liable, and that, since complainant's property was taken to discharge an obligation primarily resting upon said Cohn and Wilkerson, it was entitled to a decree against them.

(b) That, since the judgment was purchased by the defendant Jacob May on money raised on the assurance and guarantee of the defendant Sam Cohn that he would see the bank lending the money paid, such payment was in fact made by Cohn, one of the judgment debtors, and that the judgment was thereby satisfied in full; that the clerk of the supreme court had no power to issue execution on this judgment so satisfied; that the levy of the execution by the defendant McCampbell on the property of complainant was wrongful; and that the officer levying the execution, together with the defendants Cohn and May, who conspired to this end, are justly indebted to complainant for the amount of cash seized by the officer, to-wit, the sum of $10,374.39, together with interest and costs.

The answers of the respective defendants controvert the material allegations of the bill.

The chancellor held that the judgment was not in fact satisfied, and dismissed complainant's bill as to the defendants Jacob May, Louis Camp, sheriff, and T. G. McCampbell, deputy sheriff. He was, however, of opinion that the defendant Sam Cohn was primarily liable for the payment of said judgment under the facts de-

veloped in the preceding case, and directed that execution be first satisfied out of his property, and secondarily out of the property of the defendant B. F. Wilkerson.

From this decree all parties have appealed and assigned errors.

First. Was the judgment paid and satisfied?

To answer this question we must first determine the facts, and then the legal conclusions flowing therefrom.

1. As to the facts:

The determinative issue of fact discussed in the briefs and arguments of counsel is whether the defendant Cohn undertook to guarantee payment of the loan made to Jacob May by the First Savings Bank & Trust Company. We shall therefore review the testimony on this point.

(a) Mr. E. J. Hamilton, a member of the Nashville bar, was one of the counsel for complainants in the preceding case, in which the judgment was recovered against Cohn, Wilkerson, and the bank. He states that on June 3, 1921, he had a conversation with Mr. Frank P. Bond, also a member of the Nashville bar, who was then acting for the defendant Sam Cohn. Mr. Hamilton, with reference to this conversation, says:

"Q. Did he say anything about whether or not the bank with which Mr. Cohn did business had agreed or offered to advance the necessary funds with which to procure the assignment from the complainants, your clients?

"A. I don't think he said that. He said the bank expressed a willingness to make a loan to him for that purpose, if Mr. Cohn would secure it.

"Q. You mean make a loan to Col. Bond to have the judgment assigned to him if Mr. Cohn would secure it?

"A. That is right.

"Q. Did Col. Bond say whether or. not he was going to have the judgment assigned to him, and if not, why not?

"A. I cannot recall if he said he would not do that, but he said he did not think that would be the proper way to do it, some expression just about like that." .

Mr. Bond, whose deposition was taken thereafter in the case, was not questioned with reference to this testimony of Mr. Hamilton's, and says nothing on this point. .

(b) Mr. C. H. Litterer, cashier of the First Savings Bank & Trust Company of Nashville, from which the money was procured to pay the judgment, says that Sam Cohn telephoned him about the matter on June 3, 1921. This was a bank holiday, and Mr. Litterer was at his residence. He testifies that Cohn first asked him to buy the judgment, but that he refused to do so, and that possibly an hour afterwards he had another conversation, on this occasion with Mr. Bond. He testifies:

"Q. Well, what was the substance of that conversation?

"A. My recollection is that Col. Bond communicated with me the next time, and asked me if I would be willing to lend the money to some one else?

"Q. What did you tell him?

"A. I told him I would, provided Sam Cohn guaranteed it.

"Q. Did you have any other conversation with him that day?

"A. Later they called me up again and had Mr May there, and asked me to tell Mr. May over the phone that I would let him have the money.

"Q. Now you say they called you—who was present, as you understand?

"A. Well, I don't remember now whether it was Sam Cohn or Col. Bond talked.

"Q. They did the talking?

"A. Yes.

"Q. Did you understand that both of them were at the other end of the line?

"A. I thought so.

"Q. Well, did you agree to let Mr. May have the money?

"A. I did.

"Q. State whether or not there was any understanding as to whether or not Mr. Cohn would see that the money was paid, or do you know? (Objected to.)

"A. Yes; he guaranteed me that he would stand between us and any trouble in the matter.

"Q. Mr. Cohn did?

"A. Yes, sir.

"Q. Then did you agree to let Mr. May have the money?

"A. Yes, sir."

On cross-examination Mr. Litterer testifies that Sam Cohn did not sign the note either as indorser or surety, nor did he execute any separate paper guaranteeing payment of the note; that he knew the object in borrowing the money was to buy the judgment.

He further testifies:

"Q. Just state, please, what Mr. Cohn did say to you?

"A. Well, he just merely stated that he would guarantee me against any loss, if I let Jacob May have this money to buy this judgment with.

"Q. You took no written obligation?

"A. No, sir.

"Q. You knew at the time, did you not, that an obligation to stand as security for another was of no legal effect, did you not, just a verbal agreement?

"A. Yes, yes, I knew that.

"Q. Why, then, did you not have Mr. Cohn to give you a written paper of some kind showing that he was going to see the note paid? Was it not because you knew the money was to buy the judgment, and Cohn was a defendant in the judgment, and that would be collected that way?

"A. No; I knew that if Sam Cohn said he would stand behind it that he would, regardless of anything in writing."

On re-examination he testifies:

"Q. Would you have loaned this money to Mr. May, on his own application alone, if Mr. Cohn had not requested it and guaranteed its payment?

"A. No; because we were not under any obligations to lend Mr. May any money, not doing business with him."

Mr. Litterer states that the note executed by Mr. May was a demand note, dated June 4, 1921, and that on the same day a cashier's check in the sum of ten thousand dollars was issued, payable to Mr. May's order.

(c)    Thereafter Mr. Frank P. Bond's deposition was taken on behalf of defendant Cohn. After stating that he conferred with other counsel of the Nashville bar as to the propriety of having some one purchase the judgment who would be friendly to Mr. Cohn, he says:

"A concurrent view from these gentlemen gave me the courage of my own conviction, and I went to Mr. Cohn, and I said to him, 'You must get some friend of yours to buy this judgment.' I explained to him that his friend who bought the judgment would be entirely within the limitations of the law, if he did it simply as a matter of accommodation, but that he must use his money entirely, and not one cent of Mr. Cohn's money must go into the purchase. Mr. Cohn proposed to interest Mr. Roger Caldwell in securing his assistance as an act of friendship. I was advised he was out of the city. Mr. Litterer was then approached, and it resulted in my getting in touch with Mr. Louis Leftwich, his attorney, who advised Mr. Litterer it was undesirable, as there might possibly be litigation and result in unpleasantness between the banks. Mr. Cohn then stated to me that Jacob May, who was worth half a million dollars, was his friend, and he was quite sure he would be glad to accommodate him. I told him to get in touch with Mr. May and see what he would do. He called Mr. May over the telephone, and he said he would come down to see him at his office. I had occasion to go down to Judge Meeks' office, and I told him to arrange a meeting with May and myself, and let me talk to him before he did. In a short time May came, and Sam Cohn came to Judge Meeks' office and said, 'May has come,' and, as I had directed, he had had no conversa-

tion with him. I was at Judge Meeks' office, found Mr. May, and I explained to Mr. May what I wished. I said to him, 'Here is a joint judgment against the Central Bank & Trust Company against Mr. Cohn and Mr. Wilkerson. I understand there is an effort made to levy on Mr. Cohn's property to the exclusion of any levy on the property of the bank or Mr. Wilkerson, and, if that is done, I understand Mr. Cohn will be without redress, and he had offered to pay one-third, and that has not found favor with his joint defendants. I want you, Mr. May, if you will as a matter of accommodation, without any sort of compensation to you, to buy this judgment. I want you to pay your money for it. I don't want one solitary nickel or penny of Mr. Cohn's money to go into it. The purpose I have in view will not be accomplished if there is any of Mr. Cohn's money used. He don't need you, if it was a mere matter of paying the money. He has got it. My idea is to keep the judgment alive, and if you will do this as a matter of accommodation, you will greatly serve him. You need no indemnity,' I said to him, 'that Sam Cohn could give you, for the reason this judgment is against Sam Cohn and the Central Bank & Trust Company, both of whom are entirely solvent, and, if at any time after you purchase the judgment you experience any doubt in realizing on it, you can issue execution and get your money at once.' "

As will be noted, Mr. Bond advised Mr. Cohn and Mr. May that "not one cent of Mr. Cohn's money must go into the purchase," etc., but does not say that he advised that Cohn should not guarantee the loan to May.

Mr. Bond then details a conversation with Mr. Hamilton and Mr. Henderson (who were of counsel for the owners of the judgment in the former case), but, as already noted, no question is asked with regard to Cohn's securing the loan, etc.

Neither is Mr. Bond questioned with regard to the telephone conversation mentioned in Mr. Litterer's testimony.

It is proper to say, in this connection, that we think Mr. Bond's testimony is frank and candid, and we do not mean to be understood as intimating that there was any suppression on his part of any fact within his knowledge.

Mr. Bond further testifies:

"Q.  In causing this judgment to be sold to Mr. May, state whether or not it was your intention to keep the judgment alive, and in that way control the execution for the benefit of Mr. Cohn?

"A.  That was the only purpose which was fully explained in detail to both Mr. Cohn and Mr. May by me; it being repeatedly stated to both of them that the purpose would fail of accomplishment, if any part of Mr. Cohn's money went into the transaction.

"Q.  After Mr. May had agreed to purchase this judgment, what, if anything, did he do in your presence regarding getting up the money?

"A.  He called up his office or the bank, I do not remember which, over the telephone, and asked what was the amount of his deposit.  It is my recollection that he said it was $5,400—I know it exceeded $5,000.  I do not remember exactly the words, but I do remember he

stated he expected to borrow the money after he found he only had $5,400.''

(d)   Defendant Sam Cohn testifies that he and Mr. Bond went to the office of Mr. Jordan Stokes, Sr., and Mr. Stokes advised that he get some friend to buy the judgment, etc.   His counsel, Mr. Stokes, then asks him:

''Q.   What did I tell you with reference to your furnishing any of the money or aiding in the credit of the man who should buy the judgment for you?

''A.   You told me not to aid him in any way, and to let him pay it with his own money, which I did.''

He testifies that on the next day Mr. Bond came to his office, and is further questioned, and answers as follows:

''Q.   Wait one minute.   State what advice, if any, did Mr. Bond give you regarding aiding the man you would get to buy the judgment with either any money or credit?

''A.   Mr. Bond advised me not in any way to assist the man in getting the money or guaranteeing it in any way, but let him use his own money in buying the judgment, which I did.

''Q.   State whether or not in all your actions that you followed the advice that had been given you by these two lawyers?

''A.   Yes, sir.''

After stating that he first tried to get Mr. Roger Caldwell to purchase the judgment, but found he was out of the city, he says he then called up Mr. Litterer, ''of the First Savings Bank & Trust Company, with whom I am doing business;'' that it was a holiday, and the bank was closed; that he found Mr. Litterer at home, and told him that he wanted the bank to buy the judgment with re-

spect to which he had already talked to him (Litterer);
that Mr. Litterer was first inclined to permit the bank to
buy the judgment, but was afraid "it might antagonize
Mr. Caldwell because it was a bank connected with it;"
that he again called up Mr. Litterer and told him he had
a man who would buy that judgment. "He said any-
body you get that is good we will loan him the money to
buy that judgment."

Witness then states that he called up Mr. Jacob May,
also a member of the Hebrew race, reputed to be worth
between $500,000 and $1,000,000, and that Mr. May, at his
request, came to his (Cohn's) office and discussed the
matter with Mr. Bond. In this connection he says:

"Q.   Just state what Mr. Bond said to Mr. May about
his buying the judgment?

"A.   Mr. Bond stated to Mr. May that there was a
judgment up at the supreme court against Sam Cohn,
Central Bank & Trust Company, and Wilkerson, and he
wanted him to buy that judgment with his own money
without being indemnified by me or without any assistance
from me; that he knew the judgment was good, and he
could get his money at any time, because he knew I was
good, and he knew the Central Bank & Trust Company
was good.

"Q.   What then did Mr. May do?

"A.   Mr. May told him that he would do it, and Mr.
May thereupon got up and used the telephone, and called
up his factory, and wanted to know how much his bank
balance was, and I think they told him $5,400. I told
Mr. May the First Savings Bank & Trust Company would
loan him the money if he did not want to use that money;
that they said they would loan anybody the money to

buy the judgment, if they were good. I called up Mr. Litterer, and asked him if he would loan Mr. May the money.''

He further testifies:

''Q. What did you then do after you called up Mr Litterer and asked him if he would loan Mr. May that money?

''A. I told Mr. May that Mr. Litterer would talk to him, so he came to the phone. Afterwards Mr. May and Mr. Bond left my office, but I do not know where they went.''

Mr. Cohn says that on the next day he went with Mr. May to the First Savings Bank & Trust Company; that Mr. May made out a discount note on which Mr. Litterer placed his O. K., and the discount clerk gave a check for the $10,000 on the bank.

''Q. Up to that time had you said anything to Mr. Litterer that you would guarantee that they would not lose anything by obligating yourself to pay May's note or anything of that kind?

''A. No sir; I think Mr. May had done left the bank, and Mr. Litterer and I were talking and Mr. Litterer said we would not lose anything by it, and I said, 'No,' and left.''

Mr. Cohn further testifies that he has been doing business with the Fourth & First Bank, and with the First Savings Bank & Trust Company (a branch of the Fourth & First Bank) for some years; that he has been guaranteeing or securing loans for people amounting to about $1,000,000 a year; that during these years neither the Fourth & First Bank nor the First Savings Bank & Trust Company ever took his personal guarantee on any loan

that they made to any party at his request; that his custom was to indorse the note or give a letter guaranteeing payment.

He further testifies:

"Q. Did you ever give the First Savings Bank & Trust Company or to Mr. May any guarantee or promise in writing or verbally that you would pay that note that Mr. May borrowed the money with which to buy this judgment?

"A. No, sir.

"Q. Did you ever give such obligation to indemnify Mr. May or the bank as to any party of that note?

"A. No sir."

On cross-examination he testifies that Mr. May had never been a customer of the First Savings Bank & Trust Company, and further says in this connection:

"Q. He had some time in the past been a customer and patron of the Fourth & First National Bank?

"A. Yes, sir.

"Q. But he had severed his relationship with that bank, and was then doing business with another bank in the city?

"A. Yes, sir.

"Q. He had no line of credit at the First Savings Bank & Trust Company or the Fourth & First National Bank?

"A. No, sir.

"Q. But you were a regular patron of those two banks, and had a regular established line of credit?

"A. With the First Savings Bank & Trust Company, but not the Fourth & First National Bank.

"Q. They are allied institutions, are they not?

"A. Yes, sir.

"Q. Mr. May did not make application to his bank for a loan?

"A. They were closed up."

On cross-examination by counsel for Mr. Wilkerson he testifies:

"Q. Now, Mr. Cohn, you keep up pretty well with financial matters here in the city?

"A. Yes, sir.

"Q. Money was not quite as easy then as it is now? By that I mean that the banks were occupied in taking care of their own customers?

"A. Money was not as cheap then as it is now.

"Q. Don't you know that as a general rule the banks were occupied in taking care of their own customers and not going out on the market as they are now?

"A. I think so."

(e) Mr. Jacob May, examined as a witness on behalf of defendant, testifies that his relationship with Mr. Sam Cohn has been for many years friendly; that he received a telephone call from Mr. Cohn, and went to Mr. Cohn's office in response thereto, and had a talk with Mr. Cohn and Mr. Bond, and that Mr. Bond told him they wanted him to buy the judgment for friendship; to control the judgment.

"Q. Now what, if anything, did Mr. Bond tell you regarding furnishing the money yourself or getting any money from Sam Cohn or getting any credit from Sam?

"A. He told me, I should buy—I have to buy it on my own account, and I can't expect anything from Sam Cohn."

He then states that he found that he had only $1,000 or $1,500 to his personal account in the American National Bank with which he did business. That he did business with the Fourth & First National Bank when Mr. Howell was president of it, and followed him to the American National Bank.

"Q. What was your line of credit individually, if any, with the American National Bank at the time of this transaction?

"A. I think between $100,000 and $175,000."

He further says:

"Q. Now, going back to my question, after you telephoned to your office, and found the condition of your bank account, what, if anything, was done regarding borrowing the money?

"A. Sam Cohn telephoned to Mr. Litterer of the Fourth & First Trust Company Bank, and he talked a minute, and said, 'Come here to the phone,' and I went to the phone, and Mr. Litterer told me, through the phone, 'I can get all the money I asked for.'

"Q. How much money did you ask Mr. Litterer for at that time, if you did ask him for any?

"A. $10,000."

That, after arranging for the money with Mr. Litterer, he and Mr. Bond, together with Mr. Hamilton and other attorneys, went to the office of the supreme court clerk, and bought the judgment. That he gave his check on the American National Bank, although he had not then gotten the money from the First Savings Bank & Trust Company. That on the next day he met Mr. Cohn on the street, and went with him to the First Savings Bank & Trust Company, made out the note, and got the check,

and deposited the same in the American National Bank. In this connection he says:

"Q. Now, how long had you known Mr. Litterer before that?

"A. I guess for many, many years.

"Q. Did he ask you for any security?

"A. No, sir.

"Q. Did Sam Cohn at that time say anything to Mr. Litterer guaranteeing the payment of the note you had made?

"A. No, sir."

He further testifies:

"Q. Now, did Sam Cohn give you any security in any way to indemnify you against loss, if you would buy that judgment?

"A. Not one single cent.

"Q. Did he pay you anything to do it?

"A. Not a single cent.

"Q. As I understand you, you bought the judgment as a matter of friendship for your friend Sam Cohn, and told Mr. Bond to issue the execution and collect the judgment?

"A. Yes sir."

On cross-examination he says that he understood that in buying this judgment "I must buy it with my own money. I cannot look to Sam Cohn for anything."

He also says on cross-examination:

"Q. Was it explained to you that, if Sam Cohn bought the judgment in his own name, that would be a satisfaction of the judgment, and he couldn't collect it out of either the bank or Mr. Wilkerson?

"A. There was nothing said about that that I remember. I hear that afterwards."

He further says that he guesses he has a rating "up to $150,000" for a line of credit at the American National Bank, and also that he does business "with the Fourth & First National Bank all the time." He says he now has a deposit with the Fourth & First National Bank; and, questioned about his personal balance on that date at the Fourth & First Bank, replies:

"A. I will answer your questions with the greatest pleasure, all in friendship. I did have $250 in the Fourth & First National Bank on that date."

Questioned with regard to borrowing money from the Fourth & First Bank he testifies:

"Q. When was the last time you borrowed any money there before that time?

"A. I had never borrowed any money there in perhaps twenty years, so long as I had been in business.

"Q. You never borrowed any money there?

"A. Very seldom I borrowed any money; oh, once in a while.

"Q. My question is whether you had borrowed any money from the Fourth & First National Bank at that time?

"A. No, sir.

"Q. And you hadn't for fifteen or twenty years?

"A. No, sir."

Analyzing this evidence, it will be noted:

(a) That Litterer and Bond (according to Hamilton's testimony) agreed in saying that Litterer was not willing to make the loan unless it was secured by defendant Sam Cohn.

(b) Litterer is not shown to have any interest in this matter. His testimony tends to antagonize a prominent patron of his bank. It is not apparent why he would favor the complainant rather than his own customer, in so far as he might have been biased in the matter.

(c) May had no right to call on the First Savings Bank & Trust Company for an unsecured loan for this amount. He was not a customer of that bank.

(d) If May was procuring this money on his own credit, why did he not take up the matter with his own bank, where he had a line of credit up to $150,000? It is true that this bank was closed, but he made no effort to get in communication with its officials.

(e) Mr. Bond does not testify that he cautioned Mr. Cohn against guaranteeing a loan for Mr. May or against raising the money on his (Cohn's) credit. He cautioned them against using Cohn's money.

(f) May's testimony does not shed much light on the question. He was evidently somewhat confused about the whole matter, and, when asked if it was explained to him that if Cohn bought the judgment in his own name, this would be a satisfaction, etc., he replies:

"There was nothing said about that that I remember. I hear that afterwards."

(g) Money was not "easy" or "cheap" at the time of this transaction, and as a general rule banks were occupied in taking care of their own customers.

(h) Litterer says that he relied on Cohn's oral guarantee, believing he would stand to his obligation, whether written or spoken. There is nothing in the record to show that this confidence was misplaced. The transaction was by telephone, and there was no opportunity for

writing. The matter was urgent, as the parties wished to go to the clerk's office and make the purchase.

(i) We think Litterer's statement is the more reasonable. It would have been unusual for a subordinate official of a bank to make a loan of this size to one who was not a patron of the bank, with the money market in the condition shown, without taking any guarantee or security.

On the whole record we are constrained to think that the chancellor was in error in his conclusion on this point. We think the loan was made on the credit of defendant Sam Cohn, and that Mr. May, although financially responsible, was a mere man of straw in this transaction.

2. What was the legal effect of this payment?

(a) To determine this we must first consider the nature of the judgment or decree which was recovered against Cohn, Wilkerson, and the bank in the previous case of *P. A. Sowell et al.* v. *Sam Cohn et al.*, decided by this court in a memorandum opinion filed May 23, 1921.

In this inquiry we must be guided by the court's findings and opinion in that case, for that is the law of the present case on this point. See *Going* v. *Going* (Dec., 1923), 148 Tenn., 522, 256 S. W., 890, 894; *City of Bristol* v. *Bostwick,* 146 Tenn., 205, 210, 240 S. W., 774.

The essential facts as developed in that record are thus stated in the opinion:

"It appears that on August 24, 1911, complainants, P. A. Sowell and his daughter, Mrs. Tennie S. Williamson, her husband, Charles S. Williamson, Jr., joining therein, conveyed a tract of land situated in the Fifteenth civil district of Williamson county, Tenn., to the defend-

ant B. F. Wilkerson and E. T. Brown for the consideration of $16,500, of which the vendees paid in cash $4,500 and executed their note for the remainder of $12,000, payable to the order of the said P. A. Sowell and Tennie S. Williamson, said note not bearing interest and becoming due on or before five years after date, and was secured by a lien on the land conveyed. The vendees also executed to complainants their five interest notes each for $720, due on or before one, two, three, four, and five years after date. The note for $12,000 provides that it is "expressly understood and agreed that, if it is necessary to enforce payment of this note, the makers and debtors will pay a reasonable attorney's fee, and all expenses of collection.

"At the instance and request of the defendant Wilkerson a provision was inserted in the deed permitting him to subdivide and sell off portions of said land, and to provide for the release of the vendor's lien on such parts as should be sold, and, as complainants contemplated leaving the State, by mutual consent Claiborne N. Bryan was constituted trustee to hold the note, to receive payments thereon from Wilkerson, and exclusively authorized to release the lien on such portion of the land as Wilkerson might sell under this provision of the deed.

"Upon the consummation of the sale to Wilkerson and Brown the $12,000 note was delivered to Bryan, trustee, by Wilkerson, and on the same day that the deed was executed and delivered, or early the following morning, Bryan carried the note to complainants at their home near Brentwood, and told them that in order for him to make the proper credits, and to act as trustee, as provided for in the deed, they would have to indorse the note to

him as trustee. Thereupon the following indorsement, which was signed by complainants, was made on the note, 'Pay to the order of Claiborne N. Bryan, Trustee.' This indorsement was made solely for the purpose of a trust. Thereafter Wilkerson made payments to Bryan, trustee, which payments were properly credited on the back of the note, each credit being signed 'Claiborne N. Bryan, Trustee.'

"Wilkerson upon making these payments to Bryan each time saw the note in Bryan's possession, and saw him enter the credits on the back of the note. The note shows the following indorsement and credits:

"'Pay to the order of Claiborne N. Bryan, Trustee.

"'TENNIE S. WILLIAMSON.

"'P. A. SOWELL.

"'C. S. WILLIAMSON, JR.

"'No. 1.'

"'Credit by cash, August 9, 1912, $1,200.00.

"'Received of B. F. WILKERSON.

"'CLAIBORNE N. BRYAN, Trustee.

"'CLAIBORNE N. BRYAN, Trustee.

"'CLAIBORNE N. BRYAN.

"'Credit by cash, June 4, 1913, $1,835.14.

"'Received of B. F. WILKERSON.

"'CLAIBORNE N. BRYAN, Trustee.

"'Credit by cash, Sept. 11, 1915, $1,036.87.

"'Received of B. F. WILKERSON.

"'CLAIBORNE N. BRYAN, Trustee.

"'Credit by cash, Nov. 27, 1915, $1,085.00.

"'Received of B. F. WILKERSON.

"'CLAIBORNE N. BRYAN, Trustee.

" 'No. 2.

" 'Credit by cash, Jan. 6, 1917, $5,300.00.

" 'Received of B. F. WILKERSON.

" 'CENTRAL BANK & TRUST COMPANY.

" 'J. F. JOYNER, Cashier.'

"On December 20, 1915, Claiborne N. Bryan sold the note to the defendant Sam Cohn, and converted the proceeds to his own use, and has never accounted for them to the beneficiaries of said note. It appears that the purchase of the note by Cohn was within less than a month of the last credit on the note indorsed by Claiborne N. Bryan, trustee, which was on November 27, 1915.

"When the note became due payment was demanded of Wilkerson by Cohn. Whereupon Wilkerson went to the defendant Central Bank & Trust Company and procured that bank to purchase the note from Cohn; the bank paying Cohn $6,883.45, the amount due on said note, on September 29, 1916. Thereupon Wilkerson executed his note to the bank for $100 more than the amount paid by the bank to Cohn for said note, and the two notes were attached by the bank, one to the other, and held by it. On January 6, 1917, Wilkerson paid the bank $5,300, the proceeds of a sale of a part of the land upon which the note in question was a lien, which amount was credited on the note in question, and the bank thereafter released the lien on this portion of the land.

"Complainants live out of the State, and the only one who saw the note after it was indorsed to Claiborne N. Bryan, trustee, was the complainant Charles S. Williamson, Jr., who saw it in Bryan's possession in September, 1916, at which time he says he checked over with

Bryan the credits on the note, and found that they corresponded with the payments theretofore made to complainants by Bryan.

"The bill sought a recovery against the defendants and Bryan on the theory that complainants are the beneficial owners of said $12,000 note; that Bryan wrongfully and fraudulently disposed of the note; and that the other defendants took the note with notice that complainants were the beneficial owners of same, and therefore all were liable to complainants for the amount due on said note.

"The bill prayed:

"(1) That an injunction issue restraining the defendants and each and all of them, or their agents or attorneys, from disposing of or assigning the note which it is sought to be recovered upon, and from executing any formal release to the land, or any portion thereof, upon which a lien was retained in the deed from the complainants to the defendant Wilkerson to secure the payment of said note; and also enjoining the defendants, their attorneys or agents, from disposing of said note, or any portion of its proceeds.

"(2) That upon final hearing complainants be given a decree against each of the defendants, or such of them as the court might determine liable for the unpaid balance of said note with interest from date, and for a reasonable attorneys' fee.

"All of the defendants, except Bryan, answered the bill, admitting the execution of the $12,000 note by the defendant Wilkerson and Brown to complainants P. A. Sowell and Tennie S. Williamson as alleged in the bill. They admitted the transfer of the note by Bryan, trus-

tee, to the defendant Cohn, but denied that it was without the knowledge and consent of complainants. The answer averred that said note was assigned by Bryan, trustee, to the defendant Cohn with the knowledge and consent of the complainants, and for a valuable consideration.

"Both the bank and Wilkerson in their answers set out fully how the note was acquired by the bank, which was in the manner hereinbefore stated, and denied that they, or either of them, in any manner converted or aided Bryan or Cohn in the conversion of said note. All of said defendants set up certain matters in their answers by way of estoppel, which will be hereinafter referred to.

"The answers also denied that defendants were liable to complainants on said note for any amount.

"Bryan did not make defense to the bill, but permitted a judgment *pro confesso* to go against him.

"Upon the hearing the chancellor decreed in favor of complainants for the balance due on said note, together with interest and attorneys' fees; the attorneys' fees, for which a decree was entered in complainants' favor, amounted to $847.04, making the total recovery upon said note $9,377.46.

"From this decree all of said defendants have appealed to this court, and have assigned the action of the chancellor for error."

In discussing the defense of "estoppel" raised on behalf of the appellants certain other statements of fact were made in the opinion as follows:

"Nor do we think the bank can complain of the omissions of Williamson, because it had actual knowledge of the provision of the deed, and had notice of the subse-

quent entries appearing on said note, which showed the credits received by Bryan, as trustee.''

And again:

''It is sufficient answer to this contention to say that the undisputed evidence shows that all of the defendants knew of the trust at the time the note was acquired by them, as well as the contents and provisions of the trust.''

The general principles of law applicable are thus stated:

''We think this case falls squarely within the rule announced in *Alexander* v. *Alderson,* 7 Baxt., 403; *Covington* v. *Anderson,* 16 Lea, 310; *Caulkins* v. *Gas Light Co.,* 85 Tenn., 684, 4 S. W., 287, 4 Am. St. Rep., 786; and *Ford* v. *Brown,* 114 Tenn., 467, 88 S. W., 1036, 1 L. R. A. (N. S.), 188. All of these cases involved controversies between the owners of trust funds and parties who set up a title to such funds by transfer from trustees in violation of their trust, and where the paper transferred or assigned on its face gave notice of the existence of a trust. In all of those cases it was held that the word 'trustee' gave notice of the existence of a trust, and that the party taking the paper was charged with the duty of ascertaining what restrictions, if any, were imposed on the trustee in the management of the trust.

''In *Covington* v. *Anderson,* supra, where the very question we have here was passed upon, this court said:

'' 'The rule is that if one acting as trustee convert the trust property without authority, he is to be held responsible, and he who purchases from him, or aids him in the conversion, with a knowledge of the want of authority, or under circumstances that will reasonably put

him upon inquiry as to the authority to make sale or conversion, is also liable.'

"So, we think, upon the authority of the above cases, all of the defendants are liable for the conversion of said note, unless the matters urged by way of estoppel are sufficient to relieve them."

(b) It clearly appears, from this review of the former proceeding, that the defendants were held jointly liable for a conversion of the trust property.

Does this make them joint tort-feasors in such a sense that no right of contribution exists as between them?

In the case of *Rhea* v. *White* (1859), 3 Head, 121, the facts were in substance these:

In 1828 Matthew Rhea purchased a female slave of David and Samuel Hanby. It appears that at the time of the purchase the title was of record in Patrick county, Va., evidence by a registered deed; that in selling the slave to Matthew Rhea "David and Samuel Hanby were guilty of a fraudulent breach of trust, having assumed to dispose of the entire interest, when it is manifest the title to said slave was in the children of Samuel Hanby, subject only to a life estate in David Hanby and wife."

Matthew Rhea, by his purchase, therefore, acquired, at most, an "estate for the life of David Hanby and others; the title to the remainder in said slave being in the children of Samuel Hanby."

After this purchase, the slave had three children. In 1836 Matthew Rhea died, and this slave, with her increase, were divided among his children—although at the time they belonged to the children of Samuel Hanby as aforesaid.

Thereafter, in 1843, Samuel Hanby brought suit against the complainant (one of the children of Matthew Rhea), and recovered a judgment which the complainant was compelled to pay, being thus onerated for the joint act of all the distributees.

Having paid the judgment, complainant filed his bill in equity to have the recovery equalized among the other five children, or their estates, so as to cause them to share the same with complainant.

The court upon these facts said (page 122):

"The equity of contribution arises when several persons are bound by a common charge, not arising *ex delicto,* and their order of liability has been accidentally deranged. If the liability be joint, he who has paid more than his share is entitled to contribution from the rest. But this equity can never exist if the charge be not binding, or the liability arise *ex delicto;* for there can be no contribution between wrongdoers. The reason of this is that they may be intimidated from committing the wrong by the danger of each being made responsible for all the consequences. *Merriweather* v. *Nixon,* 8 T. R., 186; *Peck* v. *Ellis,* 2 J. C. R., 131."

It was further said (page 125): "We need but state the case to see there can be no relief. It is not even assisted by an allegation in the bill of ignorance of the title of Samuel Hanby's children, or that the division was made in mistake, because of any belief in the validity of Matthew Rhea's title, if that could be of any avail.

"Some of the authorities go so far as to say that with respect to mere breaches of trust, not involving any actual fraud, contribution may be had. But we apprehend these will be found to be cases growing out of the non-

performance of civil obligations, or contracts. Such is the case of *Lingard* v. *Bromley,* 1 Ves. & B., 114; also *Thweath's Adm'r* v. *Jones' Adm'r,* 1 Randolph, 328. Where the recovery is for a tort, as contradistinguished from the contract, I find no authority for contribution; and Lord Kenyon, in *Merriweather* v. *Nixon,* says there is none. And to the same effect is *Lingard* v. *Bromley.*

"But without further examination of this doctrine we think we may safely say that a recovery against a party in trover, for a joint wrong, *prima facie,* at least, if not conclusively so places him *in pari delicto,* as that he can have no contribution unless he aver and prove his inno- cence of the wrong; and that is not done in this case. *Thweath's Adm'r* v. *Jones' Adm'r,* 1 Randolph, 328."

In closing its discussion, the court further said (page 126): "As before remarked, he [complainant] does not even allege the existence of an honest belief in Matthew Rhea's title at the time the slaves were divided. If aware of its defect, at the time, we perceive no ground on which to aid him. It was incumbent on him to make out his title to relief in his bill."

This case and other authorities were reviewed by Chan- cellor Cooper in the case of *Maxwell & Co.* v. *L. & N. R. R. Co.* (1872), 1 Tenn. Ch., 8.

In that case Maxwell and others contracted with the Louisville & Nashville Railroad Company to construct certain masonry for the piers, etc., of a railroad bridge. By their negligence a passing steamboat was injured, and the owners thereof brought an action against the Louisville & Nashville Railroad Company and Maxwell & Co., and recovered a joint judgment against them.

Execution issued on this judgment, and was levied on certain property of the Louisville & Nashville Railroad Company.

Thereupon the president of the railroad company had the judgment assigned to him, executing his personal notes to the holder of the judgment for the amount thereof.

He paid the notes, but was subsequently reimbursed by the railroad company, "the arrangement having been really made for the benefit of that company, in order to keep the judgment alive, and to enable the Louisville & Nashville Railroad Company, through Guthrie (the president), as their trustee, to control the same and the collection thereof."

Afterwards Maxwell & Co., filed the original bill in the case, and sought, among other things, an injunction against the judgment, on the theory that the same had been paid and satisfied.

With reference to the case of *Rhea* v. *White,* supra, it was said (page 14):

"The case of *Rhea* v. *White* was a bill for contribution, filed by one of the distributees of Matthew Rhea, deceased, against the other distributees, to compel these latter to bear their proportion of a recovery had in an action of trover at law, for negroes divided among said distributees as part of the intestate's estate. The learned judge who delivers the opinion of the court, does say (page 125) that he can find no authority for contribution 'where the recovery is for a tort, as contradistinguished from a contract.' But he limits the actual decision to what, in his own language, he 'may safely say,' namely: 'That a recovery against a party in trover, for a joint

Central Bank & Trust Co. v. Cohn.

wrong, *prima facie,* at least, if not conclusively, so places him *in pari delicto* as that he can have no contribution, unless he aver and prove his innocence of the wrong.' The rule thus qualified is unexceptionable; for, even in the case of a recovery for a joint wrong, it gives to any one of the defendants a right to contribution, who, in his bill for the purpose, can aver and prove innocence of the wrong; and, in the case of a recovery against several not for a joint wrong, but for the separate wrong of one, for whom the others are bound by reason of their relation, as a master for the act of his servant, it leaves the question of contribution open. It would be monstrous, if the law were otherwise, for the reason of the general rule is, as stated by Judge WRIGHT in *Rhea* v. *White,* that persons may be intimidated from committing the wrong by the danger of each being made responsible for all the consequences. And this reason can have no possible application to a case where one of the parties is innocent of wrong, and only made liable by the circumstances of his connection with the property, or relation to the parties. Nay, I fully agree with Mr. Justice CLIFFORD in his opinion, expressed in *Selz* v. *Unna,* 6 Wall., 327, 336, that equal contribution among tort-feasors is not inequitable, and, although the law will not support an action to enforce contribution where the payments have been unequal, neither will a court of equity lend its aid to prevent the execution of an arrangement which secures equality of contribution. And see *Adamson* v. *Jarvis,* 4 Bing, 66, and *Jones ex parte,* 1 Molloy, 63, 71. I see no reason, therefore, even in this view of the law, if the facts are as before suggested, for actively interposing to deprive the defendants of a legal advantage, if they

have acquired any, which tends to throw the burden on those primarily liable.''

The rule is thus stated by Mr. Pomeroy: ''In the case of joint tort-feasors, equity ordinarily leaves the burden of compensation for the wrong wherever it may happen to be, as no one will be permitted to show his own wrong, in asking assistance of equity. But where several are jointly responsible for an act not necessarily nor ordinarily unlawful, one who acted without moral guilt or wrongful intent in the commission of the act, and who has paid the damages caused thereby, may recover contribution from the other wrongdoers.'' Pomeroy's Equitable Remedies, vol. 2, section 916.

A learned discussion of the question is found in the case of *Farwell* v. *Becker* (1889), 129 Ill., 261, 21 N. E., 792, 6 L. R. A., 400, 16 Am. St. Rep., 267. See, also, *Vandiver* v. *Pollak* (1894), 107 Ala., 547, 19 South., 180, 54 Am. St. Rep., 118.

In each of these cases it was held that, where creditors had, in good faith, simultaneously sued out attachments which were thereafter held to be wrongful, the right of contribution existed as between them.

In *Vandiver* v. *Pollak,* supra, it was said:

''As a general principle of the common law, it is often stated that indemnity or contribution will not be enforced as between joint wrongdoers. The reason underlying the principle is, that courts will not lend assistance to him who founds his cause of action on an immoral or illegal act—*ex turpi causa, oritur non actio.* A trespasser, confessing that he has injured or taken the property of another, is not entitled to the assistance of courts instituted as well for the protection of property as for

the protection of persons to recover indemnity or contribution from his associates in the trespass. The principle has its limitations and exceptions, and must be applied according to its true sense and meaning. A well-recognized limitation or exception, observed by the most approved text-writers, and declared in well-considered judicial decisions, some of which were referred to when this case was formerly before the court, is that if there is not a known, meditated wrong, if the parties act *bona fide,* under the supposition of the entire innocence and propriety of the act, there is not room or reason for the application of the principle. Story on Agency, section 339; Story on Partnership, section 220; Cooley on Torts, 147; Pollock on Torts, 171; Bishop on Contracts, section 216; 4 Am. & Eng. Enc. 12. And this limitation or exception prevails whether it is indemnity or contribution which is sought; there can be no distinction drawn between the one and the other. Indemnity springs from contract express or implied, and in a general way may be defined as the obligation or duty resting on one person to make good any loss or damage another has incurred while acting at his request or for his benefit. Contribution, it is true, is not contractual, it is an equity founded in acknowledged principles of natural justice. Whenever indemnity is free from the taint of illegality, in the absence of contract, under a corresponding state of facts the equity of contribution may arise—the taint of illegality cannot be imputed.''

In the present case the parties committing the conversion do not stand *in pari delicto.* Bryan was then a reputable attorney at the Nashville bar, and Cohn in good faith bought the note from him, believing his state-

ment that he had satisfied the beneficiaries. The bank in like good faith bought the note from Cohn. Although all parties knew of the trust instrument, they did not know of the fraud which Bryan had committed.

Under these circumstances we do not think they were joint tort-feasors in such a sense as that the payment by any one would be a satisfaction of the judgment. Hence, although the money was in fact paid by Cohn, yet it was the intention of the parties to keep the judgment alive, and it was not extinguished.

The chancellor, therefore, correctly dismissed the original bill against May and against the sheriff and his deputy.

Second. What are the rights of the other parties?

The bank's original bill was framed primarily on the theory that the judgment was satisfied, and the only relief prayed is upon this basis.

The chancellor was of opinion that as between the parties Cohn was primarily liable for the whole debt on the warranty implied from his sale of the note, and that Wilkerson was secondarily liable as between Cohn and Wilkerson.

We do not think that the bank should be allowed to recover the whole amount of this judgment on the theory of an implied warranty. Such a ruling would be against public policy in a case like the present, however innocent the bank may have been; for it would encourage the purchase of trust property with knowledge of the trust, and without investigation as to the title of the vendor or the rights of the beneficiaries. The purchaser, under the rule invoked by the bank, need only consider the solvency of the person offering to sell trust property, for recourse

could always be had on the theory of implied warranty.

We think that the equities of this case will be met by applying the theory of contribution.

As it stands, the bank has paid the whole judgment. While no such specific relief is prayed in its bill, we think it should be permitted to recover against Cohn and Wilkerson (Bryan being admittedly insolvent) two-thirds of the amount so paid by it, from each one-third.

The decree of the chancellor as thus modified will be affirmed.

The costs will be equally divided between Cohn, Wilkerson, and the bank.